POTTER HANDY LLP
Mark Potter, Esq., CA SBN 166317
Russell Handy, Esq., CA SBN 195058
Naomi Butler, Esq. CA SBN 332664
Cara Townsend, Esq., CA SBN 220356
100 Pine Street, Ste 1250
San Francisco, CA 94111
Phone: (415) 534-7970;
Email: ServeHT@potterhandy.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Jane Doe (SF-00015)** | Case No. |
| Plaintiff, | **Complaint for Damages:** |
| | **1. 18 U.S.C. § 1595** |
| v. | **2. 18 U.S.C. § 2255** |
| **Salesforce, Inc.**; | |
| DOES 1-10, | **Demand for Jury Trial** |
| Defendants | |

1

Complaint

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................2

PLAINTIFF'S COMPLAINT...........................................................................3

    INTRODUCTION ...................................................................................3

    PARTIES .............................................................................................3

    JURISDICTION AND VENUE .................................................................4

    SEX TRAFFICKING OVERVIEW ............................................................4

    STATEMENT OF FACTS .......................................................................7

        Backpage  ....................................................................................7

        The Salesforce-Backpage Venture ..................................................12

        Plaintiff was Trafficked.................................................................33

    FIRST CAUSE OF ACTION: TVPRA ......................................................36

        Claim 1: Salesforce Liability ........................................................36

        Knowingly Benefited ..................................................................36

        Participation in a Venture.............................................................36

        The Venture Violated the TVPRA....................................................37

        Actual or Constructive Knowledge .................................................37

        Summary of Claim .....................................................................38

    SECOND CAUSE OF ACTION: CAVRA .................................................38

    PRAYER FOR RELIEF.........................................................................39

    JURY DEMAND .................................................................................39

Complaint

**PLAINTIFF'S COMPLAINT**

**INTRODUCTION**

1.  Plaintiff, Jane Doe SF-00015, files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that began in 2014, when she was 16 years of age. Plaintiff was advertised on Backpage.com ("Backpage") during the time period when Backpage was the most prolific website for commercial sex and sex trafficking in the world. For several years, Plaintiff was subjected to untold atrocities, including rape, verbal and physical attacks, humiliation, fear, and sexual assault.

2.  Defendant Salesforce knowingly benefited financially by allowing their software and technology business to facilitate and support the trafficking of Plaintiff. Salesforce provided cutting-edge software, support, and sales executive guidance to Backpage for 4 ½ years. Salesforce knew or should have known they were supporting a notorious sex trafficking website. Thus, Salesforce is civilly liable to Plaintiff pursuant to federal anti-trafficking laws and statutory remedies.

**PARTIES**

3.  Plaintiff is a natural person, currently 27 years of age, who is a resident and citizen of Goldsboro, North Carolina.[1]

4.  Defendant Salesforce, Inc. is a foreign corporation organized under the laws of Delaware with its principal place of business in California. Salesforce does

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff is filing a Motion to Proceed Anonymously based on the inherently intimate and personal nature of the allegations. Plaintiff will provide her identity to counsel for the defendants upon entry of a protective order.

3

Complaint

business in a systematic and continuous manner throughout California, including this District and Division.

5. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff will seek leave to amend this Complaint, as appropriate, to allege the true names and capacities of these fictitiously named Defendants when they are ascertained. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

## JURISDICTION AND VENUE

6. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(c)(2) because Defendant Salesforce is subject to personal jurisdiction in this District and therefore resides here for venue purposes.

## SEX TRAFFICKING OVERVIEW

8. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.

9. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual

4

Complaint

into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.

10. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.

11. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.

12. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

13. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory

5

Complaint

impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

14. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third-largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

15. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

16. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

17. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

18. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human

6

Complaint

trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

19. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

20. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, and exploit internet and social media platforms to recruit victims and market their services. Criminal organizations also engage financial and legal entities to structure and manage their operations. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

21. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Backpage**

22. Backpage was established in 2004 by Michael Lacey and James Larkin, owners of Village Voice Media Holdings, a newspaper chain recognized for publishing advertisements for unlawful prostitution services in the "backpage" classified sections of its publications. Carl Ferrer, a long-time employee, conceived the

Complaint

idea for Backpage and ultimately served as its CEO during the final years of Backpage.com.[2]

23. By the late 2000s, it became increasingly evident that classified advertising platforms and social media websites were facilitating—and profiting from—pornography, commercial sex, and human trafficking. Between 2008 and 2011, law enforcement publicly identified Backpage as the largest and most notorious sex trafficking and pimping website in the United States.

24. Despite these denunciations, Backpage continued to expand its involvement in online pornography and sex trafficking. According to a Senate report, Backpage's gross revenues rose from $5.3 million in 2008 to $11.7 million in 2009, and then to $29 million in 2010.

25. In 2008, the leading online marketplace, Craigslist, implemented measures to reduce sex-related advertisements on its platform. As described in the Senate Report, this development marked a turning point for Backpage.com: "Beginning in 2008, Backpage experienced a period of explosive growth by optimizing its geographic strategy and capitalizing on displaced Craigslist ad volume. Gross revenue increased from $5.3 million in 2008, to $11.7 million in 2009, and to $29 million in 2010. Revenue continued to grow significantly in the next decade, from $71.2 million in 2012, to $112.7 million in 2013, to $135 million in 2014. Due to its highly profitable and scalable platform, Backpage's EBITDA margin (a measurement of operating profitability) was an enviable 69% in 2011 and a staggering 82% in 2014." (internal quotes omitted for readability).

26. By 2010, Backpage.com had become the unchallenged leader in online advertising for human trafficking and the exploitation of women and children.

---

[2] A detailed account of Backpage's history and evolution appears in the Congressional report titled *"Backpage.com's Knowing Facilitation of Online Sex Trafficking."* https://www.govinfo.gov/content/pkg/CHRG-115shrg24401/html/CHRG-115shrg24401.htm

Complaint

The National Association of Attorneys General described Backpage as a "hub" for "human trafficking, particularly the trafficking of minors."

27. In August 2011, a group of state attorneys general called on Village Voice Media, the then-owner of Backpage.com, to shut down the site's adult services section, an action that drew widespread national media attention. A follow-up letter sent on September 16 confirmed that 51 attorneys general had joined the effort. Backpage.com refused to comply.

28. Backpage frequently drew national attention as a website that advertised human beings—predominantly women and children—for sale. Among the most persistent and informative journalists covering Backpage.com was Nicholas Kristof of *The New York Times*. In a March 17, 2012, article, Kristof exposed the severe abuse suffered by victims trafficked through Backpage.com. The article recounts the experience of "Alissa," who was trafficked at the age of sixteen. Although advertisements on Backpage portrayed women in alluring poses accompanied by enticing descriptions, the reality was starkly different. Alissa's experience was emblematic: she was isolated and vulnerable, groomed by her trafficker through compliments, promises, affection, and false hope. That hope quickly gave way to exploitation and despair. Alissa was ultimately "branded" by her traffickers as though she were property. As she told Kristof, "You can't buy a child at Wal-Mart, can you? No, but you can go on Backpage and buy me on Backpage."

29. By 2015, the Permanent Subcommittee on Investigations of the United States Senate Committee on Homeland Security and Governmental Affairs had initiated an investigation into Backpage. In January 2017, the Subcommittee issued a 50-page report, accompanied by an 839-page appendix, establishing that Backpage and its principals, owners, employees, agents, and representatives were aware that the platform facilitated unlawful activity,

Complaint

including child sex trafficking. The report confirmed that Backpage.com hosted sex trafficking involving both adults and minors.

30. Purchasing sex through Backpage.com was intentionally made simple and accessible. A prospective buyer needed only to access the internet, navigate to Backpage.com, and search for advertisements matching the buyer's preferences. Backpage.com facilitated a wide range of illegal commercial sex transactions, catering to virtually every form of unlawful demand. The scope and nature of the sex and prostitution-related offerings available on Backpage.com were widely known. Backpage.com's activities and the content it promoted were open and notorious, not concealed from the public.

31. Backpage cultivated a reputation as the most outlandish and "permissive" sex-related website on the internet. Within the commercial sex and sex trafficking community, it was widely known that the operators of Backpage.com maintained a "no-holds-barred" approach to content posted on the site. Although some portrayed Backpage.com as a "safe haven" for consenting adult sex workers, the platform was in fact heavily used by exploitative buyers and traffickers who relied on the site to facilitate sexual exploitation, abuse, and other criminal conduct.

32. News coverage detailing the abuse associated with Backpage.com was widespread and deeply disturbing. Throughout the duration of Salesforce's relationship with Backpage, it was a matter of public record that Backpage operated as a sex trafficking platform. National media outlets repeatedly identified Backpage as the leading online forum for facilitating sex trafficking and other forms of human exploitation.

33. Salesforce's hometown newspaper, the *San Francisco Chronicle*, published more than 400 articles concerning Backpage between 2009 and 2017, including multiple reports in 2012 linking the site to child sex trafficking.

Complaint

Newspapers in Dallas, Backpage's hometown, likewise published dozens of articles, as did news organizations across the country.

34. Plaintiff alleges that the majority of postings on Backpage.com consisted of illegal commercial sex advertisements, either because they involved minors or because the individuals depicted were advertised as a result of force, fraud, and/or coercion. This conclusion is corroborated by the Senate Report, which found that "Backpage knew of, and facilitated, illegal activity taking place on its website."[3] '

35. Plaintiff further contends that it is more likely than not that any individual advertised on Backpage.com—including Plaintiff—was subjected to compelled, involuntary commercial sex, whether as a minor or as an adult trafficked through force, fraud, or coercion. This reflects the fundamental nature of Backpage's business model, as demonstrated by the available statistical and empirical evidence.

36. The United States Senate Report documents that 73 percent of suspected child trafficking reports received from the National Center for Missing and Exploited Children involved Backpage. Accordingly, the majority of cases reported to NCMEC arose from the exploitation of individuals advertised on Backpage.com.

37. For years, Backpage.com continued to profit from the exploitation of women and children. Between 2013 and 2015, more than 99 percent of Backpage's revenue was derived from adult advertisements. Publicly available records indicate that Backpage generated approximately $71 million in revenue in 2012. Thereafter, its revenue increased substantially, rising from $71.2 million in 2012 to $112.7 million in 2013 and $135 million in 2014. From January

---

[3] https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/Backpage%20Report%202017.01.10%20FINAL.pdf

11

Complaint

2013 through May 2015, Backpage earned approximately $346 million in total revenue, nearly $340 million of which was attributable to online commercial sex and sex trafficking.

38. Backpage.com was widely recognized as the largest and most notorious online platform for commercial sex and coerced sex.

**The Salesforce-Backpage Venture**

39. Salesforce is the world's leading customer relationship management (CRM) company. CRM is a technology platform designed to manage a company's interactions and relationships with existing and prospective customers, with the goal of improving business relationships, operational efficiency, and profitability. CRM systems enable companies to maintain customer connections, streamline internal processes, and enhance overall business performance.

40. Salesforce also provides marketing software and tools to its customers. These products are designed to integrate with CRM technology to improve customer acquisition, communication, and sales performance. While Salesforce's software is intended to enhance the efficiency and success of businesses generally, it must be configured and tailored to the specific needs of each business to achieve optimal effectiveness.

41. The design, implementation, and ongoing support of Salesforce's software constitute a complex process tailored to each customer's unique needs. Salesforce's business model is founded not only on the technology it provides, but also on the affirmative support it offers, both of which are intended to promote the success of its customers' business operations. Accordingly, Salesforce operates under the guiding principle that "your success is our success."

12

Complaint

42. Salesforce presents itself as a "customer company." The software it sells is designed to support customers in achieving their specific business objectives and to accommodate their unique operational needs. Salesforce provides a range of support services to assist customers in meeting those goals, and the design, implementation, and support of its platform are complex processes tailored to each individual business. Consistent with this approach, Salesforce has promoted itself with the message, "Get more than a CRM. Get a Strategic Partner." At its core, Salesforce's business model combines advanced technology with affirmative customer support, both of which are intended to enhance the success of customers' business operations.

43. Salesforce did not simply provide Backpage with an off-the-shelf software product and disengage from the relationship. Salesforce's software required customization to align with each customer's specific needs and business objectives. Accordingly, Salesforce sold—and continued to sell—Backpage tailored solutions designed to support Backpage's business model and growth, while also providing active and ongoing support customized to Backpage's operations. Through these products and services, Salesforce's customer relationship management and marketing software assisted Backpage in operating its business, managing relationships with existing customers, marketing to new customers, and increasing profitability.

44. The first contact between Backpage and Salesforce was instigated by Dan Hyer of Backpage on July 9, 2012, when Hyer called Salesforce.

45. Gillis subsequently engaged in follow-up communications consistent with Salesforce's customer-centric philosophy. In those communications, Gillis emphasized on numerous occasions the importance of understanding the customer in order to maximize the value of Salesforce's software.

46. A second Salesforce employee sent an email to Backpage CEO Carl Ferrer on July 9, 2012, again inquiring about the company's "business objectives." From

Complaint

the outset, Salesforce knew it was contemplating a business deal with Backpage.com

47. Salesforce personnel continued to engage with Backpage in efforts to secure its business. On July 26, 2012, account executive Dana Mottet sent an email to Dan Hyer seeking to schedule a meeting "to learn more about your top business objectives for this project."

48. On October 29, 2013, Dan Hyer contacted Salesforce to renew discussions regarding CRM software and spoke with Salesforce employee Ibraheem Rakie. During the call, it was clearly disclosed that the prospective customer was Backpage.com. Topics discussed included the ease of customizing fields, the ability to send emails through the system, and Backpage's interest in customizing customer and account templates.

49. Salesforce assigned account executive Mark Raymo to be the point of contact with Backpage.com.

50. Thereafter, Raymo and Dan at Backpage (dan@backpage.com) communicated regularly and developed a cordial working relationship, including informal exchanges and humor about personal travel. For example, Raymo wrote, "I'll be in Napa, but will confine my wine buzz to non-work hours." During these communications, Raymo also discussed offering favorable purchase terms to Backpage, stating, "Let me get as aggressive as I can."

51. In addition to providing technical support, Salesforce actively cultivated its relationship with Backpage through other means. From the outset, Salesforce extended special financial incentives to Backpage, including favorable pricing and software terms, such as "additional discount points on data storage."

52. Salesforce employees maintained regular contact with Backpage, such as monitoring the results of board meetings at which business decisions were made:

Complaint

On Thu, Nov 7, 2013 at 9:41 AM, Mark Raymo<mraymo@salesforce.com> wrote:
Hi Dan,

I trust all is well!

I just left you a VM, but I thought email might be a better way to reach you.

I'd love to connect to set some next steps, and learn the results from the Board meeting.

When is a good time to talk?

Thanks in advance!

Mark Raymo
312-288-3682

53. After deciding to purchase software from Salesforce, Backpage identified the customer as "Website Technologies," a shell corporation created by Backpage's owners:

---------- Forwarded message ----------
From: **Dan Backpage** <dan@backpage.com>
Date: Fri, Nov 8, 2013 at 3:41 PM
Subject: Re: Salesforce.com
To: Mark Raymo <mraymo@salesforce.com>

Hey Mark,

Please send me a contract for the two year proposal.

Legal will need to vet.

Use company name:

Website Technologies, LLC
2501 Oak Lawn
Suite 700
Dallas, Texas, 75223

I do not see us meeting the 11/15 date, as there are signatures that will come from board members who are presently overseas.

Legal always takes forever, but maybe they will get through it before Thanksgiving.

Dan

54. Account executive Raymo reported the transaction with Backpage to Adam Johnson, Regional Manager for the Southern Region of the US:

15

Complaint

From: Mark Raymo <mraymo@salesforce.com>
Sent: Friday, November 08, 2013 1:44 PM PST
To: Adam Johnson <adam.johnson@salesforce.com>
Subject: Fwd: Salesforce.com

Do you have time to talk about this?

It's backpage

Mark Raymo
salesforce.com
312-288-3682

Need More Leads??? http://www.data.com/

55. Raymo also informed Kevin Meagher, Vice President of Commercial Sales, of the Backpage transaction via email. In that communication, Raymo stated, "We will need to offer some incentives to win this compete from Sugar. I wanted to socialize this with you so we can begin the conversations up the ladder."

56. Raymo remained in touch with Backpage, sending an email on November 12, 2013, stating: "I'd love to connect…. As you might imagine, my executive team is keen on receiving updates on this potential strategic partnership."

57. Salesforce's executive team monitored the Backpage transaction as it progressed. Adam Johnson referred to the Backpage deal as "critical for November," and Raymo maintained ongoing communication with the executive team throughout the process. For example, Raymo stated, "I just want to clarify a few final points so I can appropriately update my management team." The Regional Manager was also personally involved in discussions with Backpage.

58. The first contract between Salesforce and Backpage had an order date of November 18, 2013, for 500MB of data storage and 56 licenses for Salesforce Enterprise Edition.

16

Complaint

59. During this period, the identity of the customer purchasing Salesforce software abruptly changed from Backpage.com LLC to a shell corporation named Website Technologies LLC. Between Monday, November 25, and Thanksgiving on November 28, more than fifty communications concerning Backpage occurred, including internal emails, internal chats, communications with Backpage, and emails involving Scott Spear. These communications culminated in the execution of a signed contract on Friday, November 29, 2013.

60. Salesforce celebrated the deal with Backpage, posting it as a "Big Deal Alert." Mark Raymo remarked: Truly a team win on this one…."

61. Over the following four and a half years, Backpage repeatedly sought and received technical support from Salesforce regarding its use of the Salesforce CRM software. Initially and on an ongoing basis, Backpage encountered issues related to implementation, navigation of software features, and understanding the platform's capabilities. To address these matters, Backpage regularly requested assistance from both Salesforce's technical support personnel and its account executives. In practice, Backpage relied extensively on Salesforce for guidance and solutions to a wide range of issues, from routine questions to more complex operational challenges.

62. One example of a "sales task" occurred on January 6, 2014, when Salesforce account executive John Mark Nismal assisted Backpage employee Randlow Smith, who was experiencing difficulty logging in using the data loader. Shortly thereafter, on February 5, Backpage employee Randlow Smith again contacted Salesforce seeking guidance regarding the "Email Relaying Feature" and was advised that the feature should be activated by a Salesforce specialist.

63. On February 7, 2014, Backpage contacted Salesforce regarding the activation of the "Email Relay" feature for its organization. This functionality enabled Backpage to use multiple email domains when sending communications to

Complaint

customers and prospective customers of Backpage.com and other sex-related websites.

64. On February 7, 2013, another Salesforce account executive spoke with Backpage after Backpage requested assistance with "Apex triggers." Apex is the proprietary programming language integral to Salesforce's CRM platform, and Backpage required guidance to use it effectively. Salesforce provided that assistance. These interactions represent early examples of Salesforce's participation in a venture with Backpage by helping its customers modify, configure, and manage the CRM software to accommodate Backpage's specific operational needs.

65. While Backpage was generating headlines for the sexual exploitation of human beings, Salesforce continued to cultivate its relationship with Backpage. The Salesforce account executives responsible for the account understood that they were working with Backpage—not merely "Website Technologies"—and actively sought to develop that relationship, as reflected in communications stating, "I look forward to working with you and Backpage.com!":

On Tue, Mar 4, 2014 at 9:54 AM, Andrew Zobrist<azobrist@salesforce.com> wrote:
Dan & Randlow,

I wanted to follow up my calls this morning and provide you both my contact information.

As I mentioned, I'll be in Dallas this week and would be happy to get together Friday 30 minutes to connect in person. I understand the board is in town Wed/Thursday so if things are too hectic I will look to set something up in 3-4 weeks.

I look forward to working with you and Backpage.com!

All the best,
Andrew

**Andrew Zobrist**
Account Executive | Salesforce.com
Office: 312.821.6379
Mobile: 312.465.8968

66. There are numerous instances in which Backpage granted Salesforce access to the Backpage org for the purpose of performing specific tasks.

Complaint

67. On March 26, 2014, Salesforce contacted Backpage. Although the precise nature of the issue is not documented, the call log reflects that Salesforce "[a]dvised we reopen the case and request to grant us login access to their org."

68. Hyer and Salesforce engaged in ongoing communications regarding methods for searching Backpage's contacts. Salesforce explained that Backpage "can develop custom code and use SOQL to execute a wildcard search," providing an illustrative example, and also offered "additional options to consider that would not require any development work." Throughout this period, Backpage continued to receive regular assistance from Salesforce account executives, mid-level management, and support personnel. When issues arose, it was customary for Salesforce to direct Backpage to its assigned account executive for further assistance.

69. The result of ongoing "assistance" from Salesforce was to facilitate and make more efficient the business of Backpage - which included human sex trafficking.

70. The "technical support" Salesforce provided to Backpage consisted of configuring, tailoring, and customizing Salesforce's standard software for Backpage's specific use. Documents produced in ongoing litigation memorialize dozens of communications between Salesforce and Backpage concerning a wide range of technical support and software management tasks. These tasks included both routine, ministerial actions and substantive guidance on configuring Salesforce's customer relationship management tools to perform functions required by Backpage's operations.

71. By mid-2014, Patrick Conner was among the Backpage employees who interacted frequently with Salesforce. On June 18, Patrick@Backpage.com contacted Salesforce seeking assistance with "formula fields." A Salesforce employee responded, "For me to be able to give a good recommendation,

19

Complaint

please allow me to see and check this field. Kindly provide me with grant login access." Patrick subsequently granted Salesforce access to the database.

72. Approximately one year after onboarding Backpage as a client, Regional Sales Manager Adam Johnson communicated with Backpage regarding the potential use of Salesforce "investment funds" to subsidize the purchase of Salesforce technology. Johnson sought the assistance of Area Vice President Kevin Meagher in pursuing this effort.

73. In early 2015, Salesforce Account Executive Kelly Goyette contacted Backpage regarding marketing and mass email communications. Goyette indicated that she was "doing some research" on Backpage's behalf and inquired about the company's plans for "email/marketing communications." The correspondence referenced "drip campaigns," a well-known form of automated mass marketing that can be efficiently implemented using Salesforce's CRM and marketing software.

74. Backpage expressed strong approval of Account Executive Goyette's work and directly contacted Regional Vice President Joe Curtis to commend her for providing "thoughtful solutions" to issues encountered by Backpage:

From: Dan Backpage <dan@backpage.com>
Sent: Thursday, January 29, 2015 6:59 AM PST
To: joseph.curtis@salesforce.com <joseph.curtis@salesforce.com>
Subject: Kelly Goyette

Hi Joseph,

I am reaching out to compliment you on Kelly Goyette. She continues to be incredibly easy to work with. She also strategically assisted us with thoughtful solutions to keep up with our exponential growth:

* We started with 56 salesforce licenses
* We added 62 force.com licenses
* We doubled our data storage capacity

We would like to retain Kelly as our Sales Rep as we continue to scale through 2016 and beyond. She has a solid understanding of our growth related needs. She's initiated solutions we were not aware of, nor would we have utilized if she wasn't our Sales Rep.

We were recently purchased by a Dutch company. They are Sugar fans; they are hyper sensitive to cost/expenses. In renegotiating our contract at the end of this year, I can sell the Dutch board against Sugar. We would greatly appreciate continuing with Kelly through that process.

Much Success,

Dan Hyer
Director of Sales & Marketing
backpage.com
(469)317-6002

20

Complaint

75. Backpage engaged in ongoing and substantive communications with Salesforce regarding CRM configuration issues. In one instance, Patrick@Backpage consulted with Salesforce about using the Salesforce platform to perform an "Advanced Search" function. The discussions regarding advanced search functionality continued, during which Salesforce asked, "Are you okay if I create a few test records too?" Patrick responded, "Absolutely! Whatever you need." The following day, Salesforce relayed a response from its "internal team," which, based on the context, consisted of Salesforce software engineers or CRM and marketing specialists involved in supporting Backpage.

76. Salesforce records reflect ongoing and substantive interactions between Backpage and Salesforce personnel, including members of Salesforce's internal teams who provided specialized expertise. Salesforce continued to offer affirmative, targeted solutions tailored to Backpage's business needs. In addition to providing strategic guidance, Salesforce also offered practical instruction on the use of its CRM software, advising, for example: "Your sales reps can create custom views to help manage their tasks. Let me know if you have any questions or time to talk today."

77. Salesforce knew that Backpage had plans to open business operations overseas –with "Dan Backpage" telling Salesforce: …whatever you can do on the front end should pay off well for you.":

On Nov 5, 2013, at 4:48 AM, Dan Backpage <dan@backpage.com> wrote:

We will open 1 or 2 marketing divisions overseas, so that will compound the expense with the added licenses and storage space. I can't give you a hard number, but budgets estimate 10 to 15 on top of the 10 we'll add in the US.

So, whatever you can do on the front end should pay off well for you.

21

Complaint

78. On June 3, 2015, Salesforce employee Nathan Snyder spoke with Backpage employee Patrick Conner, as reflected in contemporaneous notes. Salesforce was aware that Backpage was considering relocating aspects of its business to Amsterdam, but Backpage lacked the expertise to accomplish that transition without assistance and facilitation from Salesforce. During the discussion, Backpage provided Salesforce with an update on its operations and outlined several business objectives, including hiring employees in Amsterdam, implementing "drip" marketing campaigns, and pursuing specific company goals.

79. Salesforce assisted Backpage in operating its business, managing relationships with existing customers, marketing to new customers, and increasing profitability. These activities extended well beyond mere "technical support." Over a period exceeding four years, Salesforce sold Backpage targeted solutions designed to meet the specific needs of Backpage's business and provided active, ongoing support tailored to those needs.

80. While Salesforce continued to provide affirmative assistance and support to Backpage, Backpage was frequently the subject of national media coverage. In July 2015, major credit card companies ceased allowing Backpage to process transactions through their networks, discontinuing their relationships for stated "moral, social, and legal" reasons.

81. Despite widespread media coverage linking Backpage to sex trafficking, Salesforce continued to pursue Backpage's business. On August 11, 2015, Salesforce sales leader Shahbaaz Kara-Virani emailed Backpage CEO Carl Ferrer to solicit additional business. The message reiterated the same objectives that initially brought Salesforce and Backpage together: to "find more customers…win more business and ultimately keep customers happy."

82. On November 23, 2015, the parties did a renewal for one year.

Complaint

83. In February 2016, the Salesforce account executive responsible for the Backpage account was Dustin Kolo. During that time, Patrick@Backpage contacted Salesforce seeking assistance with licenses and data storage and referenced the "tumultuous year" Backpage had experienced. This correspondence followed Backpage's loss of payment processing services, a U.S. Senate investigation, and ongoing efforts to relocate operations outside the United States, all of which explain the characterization of the prior year as tumultuous. Kolo responded to Patrick and introduced him to Backpage's new Salesforce account executive, Charlie Sonnenberg.

84. On February 26, 2015, Sonnenberg spoke by telephone with Backpage employee Patrick Conner and subsequently sent a follow-up email that concluded with an invitation for "lunch or drinks." Sonnenberg also recorded notes memorializing the conversation, including the information exchanged, Backpage's current business status, and its plans for the future. Those notes referenced Backpage's perceived market opportunity following Craigslist's shutdown of its adult services section.

85. Based on these records, Salesforce was aware that (1) Backpage was increasing its market share as a result of Craigslist's discontinuation of adult advertisements; (2) Backpage had lost access to payment processors, including major credit card companies, due to the nature of its business; (3) Backpage was required to scale back operations in response to heightened scrutiny and regulatory pressure; and (4) Backpage relied on Salesforce's systems to track its activities and support continued business growth.

86. A quotation produced by Salesforce in March 2016 identifies the customer as Backpage, demonstrating that Salesforce was fully aware of the customer's identity and nonetheless chose to continue doing business with Backpage on an ongoing basis.

Complaint

87. With Salesforce's assistance—including software, marketing technology, and personalized operational support—Backpage was able to collect extensive customer data and use that information to streamline communications and overall business practices. Backpage maintained millions of customer accounts. Given the largely criminal nature of Backpage.com's operations, users frequently created accounts for limited periods, resulting in substantial volumes of outdated and transient data. Salesforce's CRM and marketing software were critical to managing and organizing the data generated by this high-volume customer base.

88. Salesforce's CRM and marketing software, together with related technologies, enabled Backpage to manage and communicate with hundreds of thousands of individuals who used Backpage.com. These activities were organized through Salesforce's customer relationship management tools and supported by ongoing assistance provided by Salesforce as needed.

89. Salesforce "Instance" is the computer platform on which Salesforce maintains customer data. Salesforce Instance na18 (North America 18) was used by Backpage to email customers.

90. There are hundreds of documented instances of Backpage using Salesforce technology—including its CRM and marketing software, together with the Salesforce Instance na8 instance—to communicate with Backpage's customers. Backpage could not have effectively managed or interacted with its customer base of approximately six and a half million users without the state-of-the-art customer relationship management tools provided by Salesforce.

91. The same email functionality, enabled through Salesforce's software and support, was used by Backpage's owners to communicate with users of Cracker.com, an international sex website owned by Backpage. Salesforce's Instance na18 served as the email server supporting marketing communications sent to Cracker.com customers.

24

Complaint

92. Backpage also used the Salesforce NA18 instance to identify "related accounts" among its users. By leveraging Salesforce's software to detect and consolidate duplicate accounts, Backpage was able to streamline its customer database and focus its marketing efforts on active users of Backpage.com.

93. Backpage used Salesforce's platform and email capabilities to operate and support its sex trafficking enterprise. The integrated combination of sophisticated CRM software, marketing technology, applications, and email functionality was not accessible to the general public. Salesforce facilitated Backpage's use of these capabilities and retained the ability to terminate or disable this marketing and messaging functionality at any time.

94. On March 16, 2016, Account Executive Charlie Sonnenberg contacted Patrick@Backpage by both telephone and email. Aware of Backpage's growth plans, Sonnenberg offered Salesforce's assistance, stating that he was willing "to do whatever we can to help you all get there."

> On Wed, Mar 16, 2016 at 3:30 PM, Charlie Sonnenberg<charlie.sonnenberg@salesforce.com> wrote:
> Hey Patrick,
>
> Just left you a VM - wanted to follow up and make sure everything went well with the order last week, and set up some time for me to meet with you and Carl. Very excited to hear about your growth plans for this year and we want to do whatever we can to help you all get there!
>
> I could even do lunch / coffee / drinks tomorrow or Friday, if you all have availability.
>
> Thanks,
> -Charlie
>
> Charlie Sonnenberg
> Account Executive - SMB | Salesforce
> Cell: 314.578.2202

95. The next day, the United States Senate held Backpage in contempt for failing to comply with a Congressional subpoena concerning sex trafficking on Backpage.com.

96. As part of Backpage's plan to relocate its operations from Dallas to Amsterdam, Backpage proposed creating a separate Salesforce "org" in the Netherlands to house customer data. Establishing a separate org would have enabled Backpage to continue its operations from Amsterdam while placing

Complaint

customer data beyond the reach of United States law enforcement. In pursuing this objective, Backpage attempted to migrate customer information but encountered technical difficulties. Backpage sought assistance from its account executive, Charlie Sonnenberg, who engaged in discussions regarding the migration challenges and offered potential solutions and support.

97. Salesforce.com and its CRM software affirmatively assisted Backpage in relocating its business operations outside the United States. Salesforce was aware that Backpage relied on its assistance to migrate data to Amsterdam. In furtherance of this effort, Sonnenberg enlisted Salesforce Solution Engineer Matthew Kramer to support the data migration process.

98. Between 2013 and 2018, Salesforce contacted Backpage on multiple occasions to evaluate its operational needs. One such instance occurred in August 2016, when Senior Success Manager Ben Heitlinger reached out to Backpage to offer an assessment of its operational requirements—an evaluation Salesforce refers to as a "Business Review."

99. In September 2016, Backpage employee Patrick Conner contacted Sonnenberg seeking additional licenses and expressing a desire to pay in bitcoin.

100.    On October 8, 2016, Backpage CEO Carl Ferrer was charged with pimping a minor, an arrest that generated nationwide media coverage. The Backpage case was a joint state and federal proceeding involving the United States Attorney, the Texas Attorney General, and the California Attorney General.

101.    On November 11, 2016, approximately one month later, Charlie Sonnenberg spoke with Patrick Conner regarding a "renewals discussion." During the call, Sonnenberg discussed Backpage's current business operations, its need for additional licenses, and the opening of an office in Amsterdam.

102.    Several weeks after Carl Ferrer was arrested for child sex trafficking, he signed another contract renewal with Salesforce.

26

Complaint

103.    The United States Senate released its findings from the investigation of Backpage on January 10, 2017. The report was entitled "Backpage.com's Knowing Facilitation of Online Sex Trafficking:"

104.    On January 10, 2017, Backpage executives, who had been subpoenaed to appear before the United States Senate, declined to testify and instead invoked their Fifth Amendment right against self-incrimination. The event received widespread coverage across major national news outlets.

105.    Despite extensive nationwide publicity, Salesforce continued to provide assistance to Backpage. In early 2017, Salesforce account executive Riley Humes managed activity on the Backpage account and placed five calls to Patrick Conner on January 26, 2017, to continue providing the support that Backpage needed and sought.

106.    As of January 26, 2017, Salesforce was actively seeking to expand its business relationship with Backpage, despite the U.S. Senate having concluded only days earlier that Backpage knowingly operated a sex trafficking enterprise. On that same day, Sonnenberg engaged in an extended chat discussion with Pardot marketing specialist Peter Kim concerning Backpage. Here is an excerpt:



Complaint

107.    This type of exchange provides clear evidence that Salesforce was aware that Backpage was not a legitimate business and was deeply entangled in controversy and litigation. Such information should have prompted Salesforce to immediately terminate its relationship with Backpage. Instead, the evidence supports the conclusion that the legality and nature of Backpage's operations were immaterial to Salesforce so long as Backpage continued to purchase Salesforce products.

108.    On the following day, January 27, 2017, Salesforce sold Backpage an advanced marketing software product known as Pardot. Salesforce also agreed that its Pardot implementation team would work with Backpage "to make sure you all get up and running quickly."

109.    In early 2017, responsibility for the Backpage account transitioned from Charlie Sonnenberg to Michael McLaughlin. On February 21, 2017, Sonnenberg briefed McLaughlin regarding Backpage as a customer:

From: Charlie Sonnenberg <charlie.sonnenberg@salesforce.com>
Sent: Tuesday, February 21, 2017 5:56 AM PST
To: Michael McLaughlin <michael.mclaughlin@salesforce.com>
Subject: Re: Automation of SF to Pardot

Let's try this again (-Patrick, haha).

I transferred the oppty over, so you should be able to see it - if not let me or Jake know and we can log a case for it.

On a side note, this account is awesome. They've been in some legal trouble recently, but they're super engaged and absolutely love the platform. They're growing and adding licenses like crazy, and there could be a couple other plays for you this year. They were a big account for me last year and I anticipate them to be the same for you this year.

Anyway, have a great time in Russia and we'll catch up when you're back!

Charlie Sonnenberg
Account Executive | Salesforce
Cell: 314.578.2202

110.    A recurring operational challenge for Backpage was managing a user base of approximately 6.5 million accounts, many of which reflected little or no recent activity on Backpage.com. Backpage sought to identify users who had recently purchased advertising on the platform and to exclude inactive accounts. To that end, Backpage asked Salesforce for guidance on configuring the software to identify users who had engaged with Backpage.com within the preceding 90 days, so that only those users would be imported into Pardot.

Complaint

111.    Salesforce provided guidance to Backpage in implementing the new software to improve operational efficiency and expand its customer base. McLaughlin exchanged messages with Patrick regarding Backpage's requirements for automating the integration between Salesforce and Pardot, advising Patrick that he had "my team looking into automation of leads."

112.    Patrick shared the code he had developed to update leads associated with Backpage customers. This exchange illustrates how CRM and marketing software must be configured to align with a business's objectives. In this instance, Backpage sought to import into Pardot only those Backpage.com users whose records reflected an "email verification date" or a "last transaction time" within the preceding 90 days.

113.    McLaughlin enlisted additional internal support at Salesforce to address the configuration of Pardot needed to automate Backpage.com's processes. Concurrently, McLaughlin sought solutions for Backpage through Salesforce's internal resources and specialists, noting: "Red Flags: We need to confirm ability to send contacts, based on custom criteria, automatically to Pardot. We have found a solution for this and are communicating with the customer and the partner."

114.    When Backpage faced the imminent seizure of its operations by the United States government and sought to establish and maintain a duplicate version of its operating systems and platform in order to relocate and continue its business overseas, Salesforce facilitated this system reorganization and provided the necessary technical infrastructure.

115.    In April 2017, Backpage began relocating its operations to Amsterdam and creating separate Salesforce platforms (orgs) in the United States, specifying which data would be placed "in cold storage." With Salesforce's assistance, Backpage established and maintained a duplicate copy of its operational systems and platform to support its effort to move and continue

Complaint

business operations overseas. It is alleged that Salesforce facilitated this system reorganization and provided the technical infrastructure necessary for the transition. Salesforce was aware of Backpage's actions, including plans to "put our US data in our current (to be EU data only) in cold storage."

116.     As part of the "org cloning" process, Backpage sought guidance on how to migrate metadata within the Salesforce platform, and Salesforce provided that guidance.

117.     One example of Salesforce's targeted solutions involved the management of customer email data. Backpage.com maintained thousands of user accounts associated with individuals who accessed the site infrequently or only once, yet whose contact information remained stored in the Backpage org maintained and supported by Salesforce. Backpage sought to remove these "stale" users from its system and requested guidance from Salesforce on how to accomplish this task.

118.     In a very revealing interoffice email, Salesforce notes that Backpage may not want to use an outside consultant "given the nature of their business.":

> **From:** Matt Rash <mrash@salesforce.com>
> **Sent:** Tuesday, July 25, 2017 7:18 AM PDT
> **To:** Daniel Sienkiewicz <dsienkiewicz@salesforce.com>
> **Subject:** Re: Salesforce - Meeting
>
> Morning Daniel,
>
> I just wanted to send along his response. He is going to engage with his Devs on this and I think that may be the best course of action here. They don't have Premier Success and given the nature of their business, I am not sure if they would engage a partner. I'll see if they would entertain either of those options though.
>
> Thank for all your help here!
>
> MR

119.     Internal notes at Salesforce dated September 19, 2017, demonstrate Salesforce's work to help Backpage move its operations to Europe and create two "Orgs" (Salesforce platforms). Salesforce accommodated Backpage – even noting that the work be done at "zero cost."

120.     Salesforce was aware that Backpage planned to divide its operations between a United States–based org and a European org. The European

Complaint

Salesforce CRM platform was to be managed by Ad Tech B.V., another shell entity created by Backpage's owners.

121.     Salesforce assisted Backpage in extending the email archive retention period to maintain ongoing contact with customers. Given Backpage's millions of users, effective management of customer email addresses was critical. While Salesforce's CRM and marketing software provided a default email archive period of 365 days, Salesforce personnel helped Backpage increase the retention period to 1,825 days.

122.     Salesforce used tools such as virtual meetings, screen sharing, and conference "bridges" to obtain direct access to the Backpage org, enabling Salesforce personnel to better understand, troubleshoot, and resolve issues related to implementation and customization.

123.     Salesforce was not a remote intermediary indifferent to Backpage's enterprise. Backpage and Salesforce entered multiple contracts over a number of years whereby Salesforce provided Backpage with software that was conformed to the specific business needs faced by Backpage – along with support from account executives, technical personnel, Salesforce solution engineers, and others. That support was direct, active, and substantial. Salesforce's role was that of an active contractual partner with Backpage.

124.     In addition to relying on Salesforce for guidance and support, Backpage possessed internal capabilities to modify the CRM and marketing software for its unlawful purposes. Salesforce's software was adapted for multiple uses that were integral to the operation and success of Backpage's business.

125.     These examples illustrate how Salesforce's advanced technology was used by Backpage to develop and operate what became the largest online commercial sex and sex trafficking platform in the world. The allegations support the conclusion that Salesforce was complicit in the growth and operation of the Backpage enterprise.

Complaint

126.    During this period, Congress was considering FOSTA–SESTA, legislation aimed at combating online sex trafficking. The legislation was directed in significant part at Backpage.com and was formally titled the Fight Online Sex Trafficking Act.

127.    At this time, the Salesforce account executive responsible for the account was Jason Ginsburg. He responded to inquiries from Backpage concerning the security of the Salesforce platform. As reflected in those communications, Backpage expressed concern about the potential access of law enforcement to the data it maintained, and Salesforce provided analysis.

128.    Referring to the outcome of the FOSTA-SESTA legislation, Salesforce asked Backpage how the "results impacted you all."

129.    Salesforce continued to inquire about any changes to Backpage, and Backpage told them that "long term plans depend on whether FOSTA is ruled constitutional or not" although the short-term plans would continue.

130.    Salesforce's Jason Ginsburg responded on March 22, 2018: "As plans develop, I am happy to help from my end."

131.    Two weeks later, the Federal Bureau of Investigation shut down Backpage.com.

132.    In summary, the business relationship between Backpage and Salesforce proved highly effective. It enabled Backpage to scale its operations and substantially expand the trafficking conducted through its platform. With Salesforce's assistance, Backpage grew into what is alleged to be the largest sex trafficking enterprise in the world. During this period, Backpage experienced "unprecedented growth" in both operations and profits, evolving from "a small company with a handful of employees" into an international organization employing more than 250 individuals across three continents.

133.    Salesforce facilitated the growth of Backpage's business, which was largely a sex-trafficking enterprise and engaged in repeated violations of 18 U.S.C. § 1591. Indeed, Backpage's business model was built upon systematic and widespread violations of that statute.

Complaint

**Plaintiff was Trafficked**

134.     Tragically, before Backpage was seized by the Department of Justice, the plaintiff was trafficked by advertisements on Backpage and compelled to engage in unlawful sex acts.

135.     At the time her advertisements appeared, Plaintiff was 16 years old, being trafficked by an adult man who forced her to engage in sex acts with "buyers", other adult men in North Carolina.

136.     Plaintiff was trafficked by a man who went by the alias "DP". DP operated a commercial sex trafficking enterprise with an associate. Together, they targeted young women and girls for trafficking through Backpage.com at local motels.

137.     Plaintiff was given the alias "I," which her traffickers used in online advertisements promoting her for commercial sex acts. These advertisements were posted on websites, including Backpage, and featured explicit images of Plaintiff. Some of these advertisements were posted while Plaintiff was under the age of eighteen.

138.     Plaintiff was subjected to extreme control and coercion. Her traffickers confiscated her identification, controlled all of her earnings, monitored her communications, and restricted her movement. Although she occasionally interacted with buyers via phone, she did so under constant surveillance and direction. She was instructed on pricing and how to communicate with clients, reinforcing her lack of autonomy. She had no possessions outside of the clothing she wore.

139.     Plaintiff endured repeated physical and sexual violence at the hands of both her traffickers and buyers. She was physically assaulted, threatened, and subjected to degrading treatment. On multiple occasions, she was forced to consume substances, including cocaine, as a means of control and compliance.

Complaint

She was also forced to participate in illegal activities, including transporting drugs.

140.    Through the Backpage.com platform, her traffickers were able to manage bookings, screen buyers, maintain branding, and sustain high-volume operations.

141.    As part of her exploitation, Plaintiff was branded with a tattoo on her arm, which served as a mark of ownership by her traffickers. This branding was symbolic of the control they exerted over her and remains with her to this day.

142.    Plaintiff was trafficked extensively between approximately 2014 and 2019 throughout various locations in North Carolina, including the city of Goldsboro and the surrounding area of Greenville. She was also transported to other cities, including Memphis, at times via bus and by vehicles operated by her traffickers.

143.    Plaintiff's daily life during this period was characterized by instability, violence, and fear. She was frequently left alone in motel rooms for extended periods, awaiting instructions or clients. She had limited access to basic necessities and no control over her circumstances.

144.    The physical harm Plaintiff suffered during her trafficking was severe. She sustained injuries that required medical attention, including facial lacerations that required stitches and a broken leg. On one occasion, she was able to escape temporarily in order to seek medical help.

145.    In addition to physical harm, Plaintiff suffered significant psychological and emotional trauma.

146.    As a direct and proximate result of being trafficked as a minor and young adult, Plaintiff has suffered profound and lasting physical, psychological, and emotional harm. The trauma she endured continues to affect her daily life, relationships, and long-term well-being.

Complaint

147.     During the period that Plaintiff was trafficked by and through Backpage, Salesforce was the sole provider, customizer, owner, manager, and operator of the platform and technology that allowed Backpage to traffic persons and promote prostitution of others, including Plaintiff.

148.     The compelled prostitution and trafficking of Plaintiff was made possible by Salesforce's platform and the technological tools, operational support, and continuous affirmative assistance, support, and facilitation provided by Salesforce to Backpage. Plaintiff's trafficker caused advertisements offering Plaintiff for commercial sex to be posted on Backpage.

149.     Buyers were able to locate, solicit, and purchase access to Plaintiff through Backpage's online marketplace. Backpage generated revenue from these advertisements and paid Salesforce for the technology and infrastructure that enabled Backpage to operate and expand its commercial sex advertising business.

150.     During much of the period that Plaintiff was trafficked by and through Backpage, Salesforce was the sole provider, customizer, owner, manager, and operator of the platform and technology that enabled Backpage to publish advertisements, process payments, manage customer data, and facilitate the trafficking of minors, including Plaintiff.

151.     As a direct and proximate result of being trafficked as a child, Plaintiff suffered severe and lasting physical and psychological injuries. Those psychological, emotional, and relational injuries caused by her trafficking as a minor are severe, ongoing, and enduring.

Complaint

## FIRST CAUSE OF ACTION: TVPRA

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 USC 1595 (against all defendants).

**Claim 1: Salesforce Liability**

152.     The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter123) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

153.   Thus, the federal sex trafficking statute consists of four elements: (a) the defendants(s) knowingly benefited, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant(s) knew or should have known the venture violated the sex trafficking statute.

**Knowingly Benefited**

154.     Salesforce knowingly benefited, financially, through its contracts, revenue, and business income, from its relationship with Backpage.

**Participation in a Venture**

155.   In order to successfully grow, expand, and maintain its business, Backpage needed a technology partner in its venture. The "venture" was Backpage's business itself, including the growth, expansion, and profitability of its business.

36

Complaint

156.   Salesforce facilitated the success of Backpage's business venture by engaging in a continuous commercial business relationship with Backpage that spanned years, providing advice and consulting on how to best implement and utilize Salesforce's software, among other things, as alleged above.

157.   It was a direct, prolonged, and supportive relationship with a confessed sex trafficker – Backpage – that implicates Salesforce for "participant" liability under 1595.

**The Venture Violated the TVPRA.**

158.   Backpage violated Sections 1591(a)(1) and (a)(2) when it advertised Plaintiff for sale, despite knowing that she was a minor from her photographs and the ads marketing her, and it financially benefited from participation in her street-level trafficking.

159.   Backpage.com executed a plea bargain in Nueces County, Texas as part of a joint Federal-Texas-California law enforcement operation. Backpage admitted to trafficking minors as part of the plea bargain. The judicial confession was signed by then-CEO and owner of Backpage, Carl Ferrer, as discussed above.

**Actual or Constructive Knowledge**

160.   The TVPRA imposes liability as to any participant in a venture that "knew or should have known" the venture engaged in illegal sex trafficking or related conduct. Hence, the federal statute compels liability as to parties with either actual or constructive notice of criminal behavior.

161.   Knowledge requires "[a]n awareness or understanding of a fact or circumstance." Knowledge, Black's Law Dictionary (11th ed. 2019). Constructive knowledge, on the other hand, is that knowledge which "one using reasonable care or diligence should have."

Complaint

162.   Salesforce gave aid to Backpage that can fairly be described as intentional and systematic, with at least constructive knowledge of Backpage's sex trafficking of minors.

163.   The totality of the direct and circumstantial evidence demonstrates that Salesforce had both actual and constructive knowledge that the venture was engaged in sex trafficking and that Plaintiff was being trafficked by its venture partner and customer - Backpage.com.

**Summary of Claim**

164.   Plaintiff alleges a claim under Section 1595. She was a victim of multiple violations of Section 1591 at the hands of both her street-level trafficker and Backpage. Backpage's business was a venture that repeatedly engaged in acts that violated Section 1591, and Salesforce should at least have known that Backpage's venture had violated and was continuing to violate that statute. The continuous business relationship between Salesforce and Backpage was sufficient to show that Salesforce participated in Backpage's venture and knowingly benefited from it.

165.   The conduct of the Defendant and its violations of the Trafficking Victims Protection Act and its reauthorization amendments were a direct, producing, and proximate cause of the injuries and damages to Plaintiff.

**SECOND CAUSE OF ACTION: CAVRA**

Child Abuse Victims Rights Act ("CAVRA")

18 USC 2255 (against all defendants)

166.   Federal law provides civil remedies for victims of child exploitation by way of a statute commonly referred to as "Masha's Law." The statute provides

38

Complaint

a cause of action for minors who were victims of a violation of enumerated federal laws, including 18 U.S.C. § 1591.

167.    Defendant Salesforce knowingly benefited financially from advertising the Plaintiff, which Salesforce knew – or in reckless disregard of the fact that – such advertising was being used to cause Plaintiff, a minor, to engage in a commercial sex act.

168.    Wherefore, by reason of the foregoing, Defendants are jointly and severally liable to Plaintiff for compensatory damages and for punitive damages, in the amount to be determined at trial, together with interest and costs.

## PRAYER FOR RELIEF

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for the actual, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post- judgment interest, attorneys' fees, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

## JURY DEMAND

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

POTTER HANDY, LLP

Dated: April 9, 2026                By: /s/ Mark Potter          .
                                         Mark Potter
                                         Attorneys for Plaintiff

39

Complaint